UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**Claude F. Rice, Jr.,**
        **Plaintiff,**

vs.                                                                 06-3214

**Roger Walker, et al.,**
        **Defendants.**

Memorandum Opinion and Order

Before the court are the defendants, Greg Sims and Roger Walker's summary judgment motion [55] and the plaintiff's response [57].

Background

On September 25, 2006, Plaintiff, Claude Rice, at that time an inmate within the Illinois Department of Corrections (IDOC), filed the instant Complaint pursuant to 42 U.S.C. §1983, against Defendant Sims, the former Warden of Taylorville Correctional Center (Taylorville), Defendant Walker, the former Director of IDOC and Co-Defendants, Dr. Rosalina Gonzalez and Health Professionals, Ltd., regarding events that occurred at Taylorville. Specifically, Plaintiff alleged deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution regarding the medical care he received for his right shoulder while incarcerated at Taylorville. On December 10, 2009, the medical defendants were dismissed from this case on their and Plaintiff's joint motion. Defendants Sims and Walker now move for summary judgment.

Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.

*Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

Undisputed Material Facts[1]

1. Plaintiff entered Taylorville on or about September 11, 2003. ( Defendants' Exhibit A, Plaintiff's Deposition, pg. 135).
2. Defendant Sims was the Warden of Taylorville from February 2, 2004, to November 6, 2009. (Defendants' Exhibit B, Sims affidavit, ¶1).
3. Defendant Walker was the Director of IDOC during Plaintiff's incarceration. (Defendants' Exhibit A, Plaintiff's Deposition, pg. 142).
4. Plaintiff claims against Defendants Sims and Walker are for their actions or inactions regarding his medical care during the time period from May 2006 to November 2006. (Defendants' Exhibit C, Plaintiff's Response to Defendants Interrogatories).
5. Defendant Sims had no personal involvement in the diagnosis, treatment, or medical care that the Plaintiff received at Taylorville Correctional Center. (Defendants' Exhibit B, Sims affidavit, ¶3). However, Sims had intimate knowledge of the lack of medical treatment provided by medical staff due to his nearly daily visits to the health care unit

---

[1]Defendants' exhibits can be found attached to his memorandum of law [56] and Plaintiff's exhibits can be found attached to his memorandum [57].

and his multiple interactions with Plaintiff. (Plaintiff's Exhibit A, Sim's Dep. 13:7-16, 15:1-4, 17:2-12 and 25:1-7).
6. Sims visited the health care unit where Plaintiff was housed at least "several days a week." (Plaintiff's Ex. A, Sims Dep. 16:8-10.)
7. Sims made it his "regular practice" to "interact" with the inmates and the staff in the health care unit. (Plaintiff's Ex. A, Sims Dep. 17:2-12.)
8. Sims remembers Plaintiff from his interactions at the health care unit. (Plaintiff's Ex. A, Sims Dep. 13:7-16.)
9. Sims specifically remembered Plaintiff having a "large knot" on his shoulder—so large in fact, that he could see the knot through Plaintiff's shirt. (Plaintiff's Ex. A, Sims Dep. 15:1-4.)
10. Sims personally described this knot as the size of a "softball." (Plaintiff's Ex. A, Sims Dep. 34:23-24.)
11. Plaintiff frequently complained to Sims about his inadequate medical treatment. (Plaintiff's Ex B, Pl.'s Decl. ¶¶ 5-6, 10, 13-14.)
12. It was part of Sims's job to pass on any concerns he may have had about the health care unit to the appropriate medical professionals. (Plaintiff's Ex. A, Sims Dep. 25:1-7.)
13. When Sims received a request from an inmate related to medical treatment, it was his practice to pass on the request to the appropriate medical professional with a note directing their attention to the matter. (Plaintiff's Ex. A, Sims Dep. 25:12-17.)
14. Emergency grievances should be directed straight to Sims. (Plaintiff's Ex. A, Sims Dep. 29:9-21; *see also* Ill. Admin. Code tit. 20 § 504.80.)
15. Sims was the Chief Administrative Officer at Taylorville as of October 2007. (Plaintiff's Ex. A, Sims Dep. 38:10-13.)
16. Defendant Walker did not personally review any grievances filed by Plaintiff[2]. (Defendants' Exhibit D, affidavit of Terri Anderson).
17. Plaintiff named Defendant Sims in his Complaint because Defendant Sims "is the person in charge of the facility. Whatever happens in this facility [Defendant Sims is] aware of, should be aware of, and [Defendant Sims] is the decision making factor in this institution on procedures and those things" (Defendants' Exhibit A, Plaintiff's Deposition, pg. 141). Plaintiff has also named Sims in his complaint because Sims has personal involvement in this action. (Plaintiff's Exhibit B, Pl.'s Decl. ¶ 14)..
18. Plaintiff named Defendant Walker in his Complaint because "As far as to [Plaintiff's] knowledge [Defendant Walker] is the Director of prisons and [Defendant Walker] is in the de—I'm assuming in the decision making factor of the procedures in prisons, whether it be health care or whatever, you know, that [Defendant Walker is] in charge of it." (Defendants' Exhibit A, Plaintiff's Deposition, pg. 143). Plaintiff has also named Walker in his complaint because Walker "knew about my condition, knew that it was potentially cancerous, knew that I was not getting any real treatment for it, and yet did nothing about

---

[2]Plaintiff asserts that this fact is material. However, the court disagrees and find that this fact is material.

3

19. it, even though he could have directed medical professionals to earnestly treat my condition." (Plaintiff's Exhibit A, Plaintiff's Decl. ¶ 15).
19. In late May 2006, Plaintiff discovered a lump on his right shoulder. (Complaint at p. 5 [1]).
20. On June 14, 2006, Plaintiff was seen by a doctor at Taylorville for complaints of shoulder pain. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 1-6).
21. The doctor ordered an X-ray and prescribed pain medication. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Number 4).
22. Following the June 14, 2006, doctor evaluation and X-ray, Plaintiff was regularly seen by medical professionals at Taylorville for his shoulder through November 2006. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 1-102). However, appropriate treatment for Plaintiff's cancer was not administered until November 2006. (Plaintiff's Exhibit B, Plaintiff's Decl. ¶ 12).
23. Plaintiff was admitted to the Healthcare unit from June 14, 2006, to June 15, 2006, for medical reasons related to his right shoulder. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Number 6).
24. Plaintiff was admitted to the Healthcare Unit from June 21, 2006, to June 25, 2006, for medical reasons related to his right shoulder. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 7-23).
25. Plaintiff was admitted to the Healthcare Unit on October 14, 2006, to October 15, 2006. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 66-68).
26. Plaintiff was admitted to the Healthcare Unit on October 17, 2006, to November 30, 2006, and monitored for difficulty swallowing and right shoulder pain. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 74-75).
27. On July 5, 2006, Plaintiff was sent on a medical furlough to St. Vincent Memorial Hospital on for a bone scan of his right shoulder. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 28-29, 31, 103).
28. The bone scan and MRI that were completed as early as July 5, 2006, and August 31, 2006, respectively, indicated the growth on Plaintiff's shoulder was "all very worrisome for malignancy, and osteosarcoma, chondrosarcoma, and rhabdomyosarcoma are all high on the list [of possibilities]." (Defendants' Ex. E pt. 2 at 55-57, Dr. Willadsen's Evaluation Report, Oct. 5, 2006).
29. On September 21, 2006, Dr. Wottowa noted that Plaintiff had "a large soft tissue mass that is eroding into the scapula. This is consistent with a sarcoma. . . . I would like to discuss these findings with him today and the serious nature of this. He needs to be evaluated in the very near future by an oncologic orthopedic surgeon . . . for a biopsy workup and eventual treatment." (Defendant's Ex. E pt. 2 at 51, Dr. Wottowa's Chart Note, September 21, 2006.)
30. On August 21, 2006 Plaintiff was sent on a medical furlough to Dr. Wottowa, an orthopedist at Springfield Clinic for an orthopedic evaluation of his right shoulder. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 44, 104-111).

31. On August 31, 2006, Plaintiff was sent on a medical furlough to St. Vincent Memorial Hospital for a radiology appointment. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 51, 112).
32. On September 7, 2006, Plaintiff was sent on a medical furlough to St. Vincent Memorial Hospital for a radiology appointment. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 52, 113).
33. On September 18, 2006, Plaintiff was sent on a medical furlough to Dr. Wottowa, an orthopedist at Springfield Clinic for a follow-up orthopedic evaluation of the mass on his right shoulder. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 54, 114-116).
34. On September 29, 2006, Plaintiff was sent on a medical furlough to Dr. Willadsen, an oncologist at St. Vincent Specialty Clinic for the mass on his right shoulder. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 56-59, 117-118).
35. On October 11, 2006, Plaintiff was sent on a medical furlough to Dr. Gilman for an oncological clinical consultation regarding the mass on his right shoulder. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 61- 64, 119-123).
36. Plaintiff repeatedly told Sims he needed a biopsy. (Plaintiff's Ex. B, Pl.'s Decl. ¶¶ 5-6, 10, 13-14).
37. As of October 5, 2006, Plaintiff's condition was so serious that he potentially faced amputation of his right arm. (Defendants' Ex. E pt. 2 at 55-57, Dr. Willadsen's Evaluation Report, Oct. 5, 2006.)
38. Plaintiff did not receive a biopsy until November 15, 2006. (Plaintiff's Ex. B, Pl.'s Decl. ¶ 12.)
39. On November 15, 2006, Plaintiff was sent on a medical furlough to Dr. Douglas McDonald at the Center for Advanced Medicine for biopsy. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 89-91, 124-130).
40. On November 21, 2006, Plaintiff was sent on a medical furlough to St. Vincent Memorial Hospital for a CT of his chest. (Defendants' Exhibit E, Affidavit of Trudy Huffman, Bates Stamp Numbers 95-96, 131).
41. Defendant Sims has no medical training and relied on the medical staff at Taylorville to provide appropriate medical care to inmates. (Defendants' Exhibit B, Sims affidavit, ¶3).
42. Defendant Sims never prevented Plaintiff from seeing a doctor[3]. (Defendants' Exhibit A, Plaintiff's Deposition, pg. 138).
43. Plaintiff has never spoken with Defendant Walker. (Defendants' Exhibit A, Plaintiff's Deposition, pg. 142). However, Plaintiff sent numerous letters, at least six, to Walker regarding his inadequate medical treatment at Taylorville and pleading with Walker to

---

[3]Plaintiff asserts that this fact is immaterial and argues that "[t]he appropriate standard is whether Defendants know of a substantial risk of harm to the inmate and disregarded that risk. *E.g., Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005). The plaintiff does not specifically state that this fact is not true, and regardless of the standard, the court finds that this fact is material.

        help him "get the Health Care [he] need[s] to save [his arm]" but Walker never provided a substantive response. (Defendants' Exhibit A, Plaintiff's Deposition. 142:17-23 and 143:1-3).

44. Defendant Walker has never prevented Plaintiff from seeing a doctor or interfered with Plaintiff's treatment decisions. (Defendants' Exhibit A, Plaintiff's Deposition, pg. 143).

45. Plaintiff's contends Defendants Sims and Walker failed to properly diagnose and treat Plaintiff's cancer. (Defendants' Exhibit C, Plaintiff's Response to Defendants Interrogatories).

Disputed Material Facts

46. Defendants assert that the only time Plaintiff indicates Defendant Sims saw Plaintiff's shoulder was while Plaintiff was in the infirmary being treated. (Defendants' Exhibit A, Plaintiff's Deposition, pg. 137). Plaintiff asserts that Sims saw Plaintiff's shoulder while Sims was in the infirmary/health care unit and when Sims encountered Plaintiff during his rounds of the facility. (Plaitniff's Ex. B., Plaintiff's Decl. ¶¶ 5-6, 10, 13; Defendants' Exhibit A, Plaintiff's Deposition 137:1-19).

47. Defendants assert that when asked to identify the basis for his claim Defendants Sims and Walker were personally aware that Plaintiff was denied adequate medical care, Plaintiff provided no evidence other than to state that they "knew or should have known." (Defendants' Exhibit C, Plaintiff's Response to Defendants Interrogatories). Plaintiff asserts that this statement ignores the other evidence that has since been amassed in thi case to support personal knowledge by both defendants. (Plaintiff's Exhibi8t A, Sims Dep. 13:7-16, 15:1-4, 17:2-12, 25:1-7, 25:12-17, 29:9-21; Plaintiff's Exhibit B, Plaintiff's Decl. ¶¶ 5-7, 10-11, 13-15).

Discussion and Conclusion

       Deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment, which applies to the states through the Fourteenth Amendment. *Walker v. Benjamin*, 293 F.3d 1030, 1036-37 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05
(1976)). Prison officials may not disregard a prisoner's serious medical needs, and thereby inflict as "punishment" the pain and preventable consequences of the condition. *Steading v. Thompson*, 941 F.2d 498, 500 (7th Cir. 1991) (citing *Estelle*, 429 U.S. 97 at 104-05). The Eighth Amendment prohibits punishments which are incompatible with "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). There is a two-prong showing to prevail on an Eighth Amendment claim based on deliberate indifference: first, the plaintiff must show his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653 (citations omitted).

Plaintiff's cancer constituted a serious medical need. "A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653 (citing *Foelker v. Outagamie County*, 394 F.3d 510, 512-13 (7th Cir. 2005)). Undoubtedly, the onset of cancer is a serious medical need. Plaintiff's cancer was diagnosed by a physician and mandated extensive treatment. Moreover, a large growth on one's shoulder—so large that it could be seen through clothing—is a condition that is "so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* Defendants do not, and cannot, contend that the onset of cancer was not a serious medical need.

Section 1983 creates a claim for relief based on personal liability and fault. *Wolfe-Lillie v. Sonquist*, 699 F.2d 864, 869 (1983). An individual cannot be held liable unless he caused or participated in an alleged constitutional deprivation. *Wolfe-Lillie*, 699 F.2d at 869. Section 1983 liability cannot be based on a respondeat superior theory. *Wolfe-Lillie*, 699 F.2d at 869. Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official. *Wolfe-Lillie*, 699 F.2d at 869. A causal connection or affirmative link between the conduct complained of and the individual sued must exist. *Wolfe-Lillie*, 699 F.2d at 869, *citing Rizzo v. Goode*, 423 U.S. 362, 371 (1976). Although it is true that a supervising prison official cannot be held personally liable in a Section 1983 claim based on a theory of respondeat superior, the personal responsibility requirement is satisfied if officials "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye . . . ." *Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir. +1995) (citation omitted)

Defendants claim that they are not liable under a Section 1983 claim for deliberate indifference to Plaintiff's serious medical needs because they had no "personal involvement" in his medical care. Defendants argue that because they did not dispense medications, or read Plaintiff's medical charts, they cannot be held liable for a Section 1983 claim predicated on medical care. However, with the facts before this court, a trier of facts could find that both Defendants turned a blind eye towards the alleged inadequate, delayed treatment of Plaintiff's cancer. Unlike *Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009), cited by Defendants, where the plaintiff simply "work[ed] down through [the prison] organization chart" when selecting defendants to sue, both Defendants here have a specific, articulable connection to Plaintiff's medical care.

Defendants further assert "Plaintiff has no evidence that Defendants were subjectively aware of [the inadequate medical care at Taylorville]" (Defs.' Mem. at 13), but the record provides a sufficient basis for a reasonable fact finder to infer the contrary. The evidence solidly demonstrates that Sims turned a blind eye towards the inadequate medical care provided to Plaintiff. Sims admits that he made it part of his regular practice to interact with the inmates and staff in the health care unit where Plaintiff was housed for days to weeks on end. Sims admits to visiting the health care unit several days a week" During these visits, it is undisputed that Sims saw Plaintiff, and specifically remembered him because of the "softball sized," "large knot" he could actually see through Plaintiff's shirt. A reasonable fact finder could

7

infer that these facts were sufficient to impart knowledge to Sims of the inadequate medical treatment afforded to one of his inmates. Even when Plaintiff encountered Sims outside the health care unit, Plaintiff made it a point to discuss his condition with Sims, explaining that he needed a biopsy to make a final determination as to whether the growth was cancerous. Though Sims readily acknowledged that as part of his duties at Taylorville, he would regularly pass on requests from inmates to the appropriate medical professionals Sims chose not to do so in Plaintiff's case. These facts establish a sufficient basis for liability under Section 1983.

Similarly, Walker had personal knowledge of Plaintiff's condition. Plaintiff sent Walker at least six letters in which he complained about his inadequate health care pleading with Walker to help him get the Health Care he needed to save his arm." Despite the desperate language contained in the letters and the emergency grievance, Walker was unresponsive. Walker does not dispute the Plaintiff's fact wherein the Plaintiff sent approximately six letter, nor does Walker deny every receiving these letters. Therefore, these letters were sufficient to put Walker on notice of the violation of Plaintiff's constitutional rights, just as the plaintiff's "many letters" to the superintendent in *Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir. 1995), were enough to put the superintendent on notice of the constitutional violation in that case. As the Seventh Circuit confirmed, "*Gentry* . . . allows the possibility that an inmate's letters to prison administrators may establish a basis for § 1983 liability." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). Plaintiff's numerous letters that received no substantive response from Walker establish a sufficient basis for Section 1983 liability because they demonstrate that Walker "turn[ed] a blind eye" towards the deprival of adequate medical treatment for serious conditions. *Gentry*, 65 F.3d at 561. Because both Defendants had personal knowledge of the Plaintiff's predicament, the court need not address Defendants' suggestion that they can avoid personal responsibility because they delegating their responsibilities to others.

Defendants also argue they are entitled to summary judgment because "Plaintiff was being seen regularly by medical staff for his shoulder issues and his condition was being monitored by medical professionals," implicitly arguing that as long as Plaintiff was given access to *some sort* of medication and medical staff, they bear no liability. However, the mere fact that Plaintiff was seen by medical staff does not preclude a finding of deliberate indifference. To prevail on an Eighth Amendment claim based on deliberate indifference, "a prisoner is not
required to show that he was literally ignored." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). If "literal ignorance" was the standard, a showing of deliberate indifference could never be made, so long as prison officials did *something* in response to a prisoner's serious medical needs, no matter how inadequate the steps were. As a result, a prisoner could never state an Eighth Amendment claim as long as a prison employed a doctor and stocked medicine, and made both available to the prisoner. The mere fact that *someone* at the prison did *something* is not a basis for summary judgment. Rather, the Defendants' actions, construed in Plaintiff's favor, demonstrate deliberate indifference. Indeed, when Sims interacted with Plaintiff while hearing about and witnessing a softball sized growth coming out of his shoulder that remained for months on end, he disregarded a substantial risk to Plaintiff's health by not following through on

8

Plaintiff's repeated complaints of lack of appropriate treatment of what would ultimately be confirmed as cancer. A reasonable fact finder could also find that despite the desperate language in Plaintiff's letters to Walker, Walker chose to disregard what was evident in those letters—that Plaintiff was suffering from a serious medical issue that needed more extensive treatment than ibuprofen and the occasional x-ray, and that, for some reason, he was not getting the treatment he needed. As *Greeno* suggests, non-medical prison officials who entirely ignore prisoner complaints can be liable for deliberate indifference. F.2d at 655-56 (citations omitted). In *Greeno*, the court found there was no deliberate indifference on the part of non-medical defendants, but only because the non-medical officials "reviewed Greeno's complaints and verified with the medical officials that Greeno was receiving treatment." *Id.* The court readily acknowledged that "perhaps it would be a different matter if [the non-medical official] had ignored Greeno's complaints entirely." *Id.* Here, there is nothing in the record to suggest that Walker or Sims reviewed Plaintiff's complaints or verified with the medical officials that Plaintiff was receiving appropriate treatment; instead, the Defendants ignored Plaintiff's complaints entirely. It appears that the treatment Plaintiff did receive was inadequate and marked by significant delay. A fact finder could infer that Defendants were aware of Plaintiff's serious medical need, and knew that the treatment he was receiving was woefully inadequate, especially in light of Plaintiff's continued complaints and repeated visits to the health care unit. These are reasonable inferences which must be drawn in Plaintiff's favor, making summary judgment inappropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Summary judgment based on the issue of qualified immunity is not appropriate in this case. A plaintiff may pierce the shield of a governmental official's qualified immunity defense. There is a two step analysis to determine whether a defendant may successfully shield himself with the defense. First, a constitutional violation must be made out. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a constitutional violation could be made out, "the next sequential step is to ask whether the right was clearly established." *Id.* For a constitutional right to be "clearly established," the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. *Id.* at 202. "The inquiry focuses on the objective reasonableness of the action, not the state of mind or good faith of the officials in question." *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir. 1996). Thus, for Plaintiff to pierce the qualified immunity shield, he must prove that the offending officers "knew" or reasonably "should have known" that their acts and omissions violated his constitutional rights. This is not to say, however, "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Rather, a plaintiff defeats a qualified immunity defense by pointing "to a clearly analogous case establishing a right to be free from the specific conduct at issue" or by demonstrating that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Wheeler v. Lawson,* 539 F.3d 629, 640 (7th Cir. 2008) (citations omitted). As the Supreme Court has confirmed, analogous cases need not be exactly the same to put an official on notice that his conduct was unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

With respect to the first step of the *Saucier* analysis, taken in the light most favorable to Plaintiff, the facts alleged show the officers' acts and omissions violated Plaintiff's constitutional rights, as discussed *infra*. Turning to the second step of the *Saucier* analysis, case law in existence at the time would have put Sims and Walker on notice that they violated Plaintiff's constitutional rights when they knew of Plaintiff's obviously serious medical need, and yet actively avoided and ignored Plaintiff's requests. The standard for whether officials have acted deliberately indifferent is well-established by existing case law: a prison official is deliberately indifferent to an inmate's medical needs when he "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Case law also establishes that the lack of medical training does not excuse liability for deliberate indifference when prison officials were made aware of a serious medical condition, and yet provided a woefully inadequate response. In *Reed v. McBride*, 178 F.3d 849, 854-56 (7th Cir. 1999), for example, the Seventh Circuit denied a non-medical prison official's motion for summary judgment when the inmate alleged he was denied life-sustaining medicine and food and had made the non-medical prison official aware of the deprivation through letters and grievances. Similarly, in *Hudson v. McHugh*, 148 F.3d 859, 863-64 (7th Cir. 1998), a nonmedical jail official's refusal to respond to a prisoner's repeated requests for epilepsy medicine was held to state a claim for deliberate indifference to a serious medical need. Furthermore, the Third Circuit has concluded that deliberate indifference can attach to non-medical prison officials if there is "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). *See also Smith v. County of Bucks*, No. 03-6238, 2004 WL 868278, at *4 (E.D. Penn. Apr. 19, 2004) (finding allegation that non-medical defendants "were informed of [plaintiff's] potentially life-threatening medical condition but refused to permit him to receive a biopsy," if true, states a claim for an Eighth Amendment violation). Consequently, Defendants were on notice that when they knew of Plaintiff's suspected cancer and knew that he was not receiving treatment for it, their inaction could constitute deliberate indifference in violation of the Eighth Amendment.

Further, it is immaterial whether Defendants subjectively knew they were violating Plaintiff's constitutional rights by avoiding and ignoring Plaintiffs repeated written and oral requests for appropriate medical care when the risk to Plaintiff was plainly obvious. Any reasonable officer would have objectively known that all of these acts violated Plaintiff's constitutional rights without question and would have hesitated before doing any one of them. Defendants should have known the same. As a result, Defendants are not entitled to a qualified immunity defense.

Based on the foregoing, it is ordered:

1. Pursuant to Fed. R. Civ. Pro. Rule 56, the defendants' motion for summary judgment [55] is denied. The plaintiff may proceed on his claim against the defendant.
2. The final pretrial conference is scheduled for March 18, 2010 at 3:00 p.m, via telephone conference. The proposed final pretrial order shall be filed with the clerk of the court by

March 18, 2010, 11:00 a.m.  The jury trial is scheduled before this court, sitting in Urbana, Illinois, on March 29, 2010, 9:00 a.m.

Enter this 16th day of March 2010.

**s\Harold A. Baker**

_____
Harold A. Baker
United States District Court